Opinion issued July 30, 2009














     


In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00717-CR




FRANK PRESTON SPENCER, Appellant

v.

THE STATE OF TEXAS, Appellee




On Appeal from the 339th District Court
Harris County, Texas
Trial Court Cause No. 1094923




MEMORANDUM OPINION

          Appellant, Frank Spencer, was charged with the offense of murder.


 Appellant
was 15 years old at the time of the offense and was certified to stand trial as an adult. 
The jury found appellant guilty and assessed his punishment at 66 years in prison. 
          Appellant raises three issues on appeal. In the first two issues, appellant
contends that the trial court abused its discretion by denying his motion to suppress
his two recorded statements. In his third issue, appellant asserts that the trial court
erred by failing to give the jury an article 38.22, section 6, “general” voluntariness
instruction.



          We affirm. 
Background
          On August 9, 2006, the body of the complainant, fifteen-year-old Jose Lorenzo,
was discovered in a park off Tanglewilde in Houston. Lorenzo had been shot in his
legs, back, abdomen, and head. Detectives G. Gonzales and R. Martinez of the
Houston Police Department’s Homicide Division were assigned to investigate
Lorenzo’s death. The detectives discovered that someone, with the street name
“Pikachu,” had sent an email to Lorenzo indicating that appellant would come to
Lorenzo’s house on the night Lorenzo was killed. 
          After they discovered that Lorenzo’s cell phone was missing from his body, the
police obtained Lorenzo’s cell phone records. Further investigation showed that in
the hours preceding his murder, Lorenzo had exchanged numerous calls with a cell
phone registered to Gloria Spencer (“Ms. Spencer”). The detectives learned that Ms.
Spencer had twin 16-year-old sons: Joseph Spencer and appellant, Frank Spencer. 
Based on the investigation, the police sought to interview the boys to learn what they
knew about the murder. Another homicide detective, B. Harris, knew the Spencers
from church. Because of his personal connection with the family, Detective Harris
agreed to act as a liaison between the Spencers and the other detectives. 
          On August 30, 2006, Detectives Martinez and Gonzales were en route to speak
to the Spencers when they saw Ms. Spencer pulling away from her home with Joseph
in the car. The detectives made contact with Ms. Spencer and explained to her that
they needed to speak to her sons regarding a homicide investigation. Ms. Spencer
agreed that her sons could speak with the detectives. 
          Ms. Spencer told the detectives that appellant was at home. Ms. Spencer drove
back to her house with the police following her. Once at the house, Ms. Spencer
agreed that her sons could be taken to the downtown Houston police station to speak
with the detectives. The boys also agreed and voluntarily accompanied the police
downtown. Joseph rode with Detective Martinez, and appellant rode with Detective
Gonzales to the police station.
          At the police station, the boys were interviewed in separate rooms. Ms.
Spencer remained in a waiting room at the police station while the boys were
interviewed. The detectives began speaking with appellant at about 10:30 a.m. A
little before 11:00 a.m., Detective Harris began videotaping the interview. 
          During the interview, appellant acknowledged that both he and the
complainant, Lorenzo, were members of the street gang, Surrenos 13. Appellant
explained that another gang member, Francisco Alviso, and two other men picked
him up at his house on the night of the murder. Appellant knew that the group
planned to kill Lorenzo. Appellant understood that the gang wanted Lorenzo dead
because he had been “snitching.” 
          Appellant told the detectives about the plan the group had to kill Lorenzo.
Appellant explained that, because Lorenzo trusted him, he was assigned to call
Lorenzo under the pretext that appellant would give Lorenzo a ride to go see a girl. 
Once appellant had lured Lorenzo out of his apartment, Lorenzo would be killed. 
          Appellant, Alviso, and the two other men, drove to Lorenzo’s apartment. Once
there, the men parked outside the apartment complex. Appellant got out of the car to
meet Lorenzo. Appellant stated that he was carrying a revolver handgun that had
been given to him by the men in the car. 
          Lorenzo walked out of the gate of his apartment complex toward appellant.
When he saw appellant, Lorenzo asked appellant who was with him. Appellant
responded that one other guy was with him. By that time, Alviso had also gotten out
of the car. 
          From behind appellant, Alviso then fired his semiautomatic handgun toward
Lorenzo, and Lorenzo began running. Lorenzo tripped and fell to the ground. 
Appellant described how he stood over Lorenzo and shot him twice in the legs. 
Appellant then described how he saw Alviso stand over Lorenzo and repeatedly shoot
Lorenzo in the upper body. Appellant stated that, after the shooting, he took
Lorenzo’s cell phone from his body and disposed of it. The first interview ended at
11:35 a.m.
          At about that time, the police finished interviewing appellant’s brother, Joseph. 
Appellant’s mother left the police station to take Joseph to school. Appellant
remained, however, and agreed to give a second videotaped interview.
          The second interview began at 12:08 p.m. While the first interview had been
conducted at times by Detective Harris and at times by Detective Martinez, the
second interview was conducted only by Detective Martinez.
          The second interview was more concise than the first interview with regard to
the description of the events surrounding the homicide. However, appellant related
essentially the same details regarding Lorenzo’s murder and his participation in it as
he had in the first interview. In addition to the information given in the first
interview, appellant explained that he had taken Lorenzo’s cell phone to conceal that
he had spoken with Lorenzo that night before the murder. The second interview
finished at 12:38 p.m.
          Following the second interview, Detectives Martinez and Gonzales took
appellant to his high school. The detectives then contacted the district attorney’s
office. After the district attorney’s office indicated that it would file charges against
appellant, the detectives contacted the police officer at appellant’s school and
instructed him to take appellant into custody. Approximately 30 minutes had elapsed
between the time the detectives dropped appellant at school and the time that
appellant was taken into custody. 
          Appellant was certified to stand trial as an adult and was indicted for Lorenzo’s
murder. Before trial, appellant filed a motion to suppress the two videotaped
statements. Appellant primarily complained that his confession should be suppressed
because the police did not inform him of his Miranda and statutory rights before he
made the inculpatory statements. The State responded that appellant was not entitled
to be informed of his rights because he was not in custody at the time the statements
were made. 
          At the suppression hearing, the State presented the testimony of Detectives
Harris and Martinez. Appellant presented the testimony of appellant’s mother, Gloria
Spencer, and of his brother, Joseph. Following the hearing, the trial court denied
appellant’s motion to suppress the two videotaped statements. 
          At trial, the State’s first witness was Miguel Beana, who is also a member of
Surrenos 13. Beana testified that appellant had phoned him the evening before the
murder and informed him that he and “his homies” were “going on a mission.” 
Appellant told Beana that “he was going to put a bullet in [Lorenzo’s] head.” After
the murder, appellant again called Beana and told him that they had killed Lorenzo. 
Appellant stated to Beana that “he shot [Lorenzo] in the leg and he shot him in the
head.” 
          After the State rested, appellant again moved the trial court to suppress his
videotaped statements on the ground that he had not been informed of his statutory
rights. As he had at the suppression hearing, appellant argued that he was entitled to
be informed of his rights because he was in custody at the time he gave the
inculpatory statements. The trial court again denied appellant’s request to suppress
his videotaped statements. In the charge, the trial court instructed the jury that it
should not consider appellant’s statements if it found from the evidence, or had “a
reasonable doubt thereof,” that the statements were a result of custodial interrogation,
and appellant had not received the appropriate statutory warnings. 
          The jury found appellant guilty of murder, and this appeal followed. We
abated the appeal to allow the trial court to file findings of fact and conclusions of
law in support of its denial of appellant’s request to suppress his recorded statements.
The trial court found Detectives Harris and Martinez each to be a “credible witness”
and “accept[ed] as true” each detective’s testimony “as to his making contact and
interviewing the Defendant.” 
          In its findings of fact and conclusions of law, the trial court also determined the
following:
          •        During the interviews, appellant was told by the homicide detectives on
several occasions that he was free to leave. 
 
          •        After appellant confessed, Detective Harris informed appellant’s mother 
that appellant had admitted to being a participant in the murder.
 
          •        Appellant’s mother made no attempt or request to stop the interviews.
 
          •        Appellant was not handcuffed during any part of the interviews.
 
          •        The officers did not display their weapons during the interview.
 
          •        Appellant never requested to stop the interviews or to speak with his
mother, any other family member, or an attorney.
 
          •        The amount of time from the beginning of appellant’s first interview
until the end of his second interview was no more than four hours.
 
          •        No evidence was presented to suggest that appellant did not understand
“what he was discussing with the Houston Police Department
investigators.” 
 
          •        Probable cause existed at the conclusion of the first interview to charge
or arrest appellant with murder. 
 
          •        Appellant was not in custody at the time he gave his two videotaped
statements to the police.
Suppression of Statements
          In his first two issues, appellant contends that the trial court erred because it
did not suppress his videotaped statements. 
A.      Standard of Review
          We review a trial court’s ruling on a motion to suppress evidence for an abuse
of discretion. See Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).
The trial court is the sole trier of fact and judge of witness credibility and may believe
or disbelieve all or any part of a witness’s testimony. See State v. Ross, 32 S.W.3d
853, 855 (Tex. Crim. App. 2000). In reviewing the record, we defer to the trial
court’s determination of facts, particularly when the trial court’s findings turn on an
evaluation of the credibility and demeanor of the witnesses. See Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997).
          When a trial court makes explicit fact findings, we must view the evidence in
the light most favorable to the trial court’s ruling and determine whether the evidence
supports the trial court’s findings. See State v. Kelly, 204 S.W.3d 808, 818 (Tex.
Crim. App. 2006). We must then review the trial court’s legal ruling de novo unless
the trial court’s explicit fact findings are also dispositive of the legal ruling. See id. 
We uphold a trial court’s ruling on a suppression motion if it is reasonably supported
by the record and is correct on any theory of law applicable to the case. See
Villarreal, 935 S.W.2d at 138. When, as here, the defense relitigates the suppression
issues at trial, we may consider evidence from the trial in reviewing the motion to
suppress. See Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).
B.      Issue of Custodial Interrogation 
          In his first issue, appellant contends that “the trial court erred in denying [his]
motion to suppress his recorded statements because he was in custody and was not
advised of his rights, in violation of Art. 38.22, Miranda, and [section] 51.095(d) of
the Texas Family Code.”
          In Miranda v. Arizona, the United States Supreme Court directed, “[T]he
prosecution may not use statements, whether exculpatory or inculpatory, stemming
from custodial interrogation of the defendant unless it demonstrates the use of
procedural safeguards effective to secure the privilege against self-incrimination.”
384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). These procedural safeguards have
been codified in Code of Criminal Procedure article 38.22. See Tex. Code Crim.
Proc. Ann. art. 38.22 (Vernon 2005). Article 38.22, section 3, prohibits the
admission of an accused’s oral statement made as a result of custodial interrogation
unless, among other requisites, the warnings discussed in Miranda, and one
additional warning found in article 38.22, section 2, were given, and the accused
knowingly, intelligently, and voluntarily waived any rights set out in the warnings. 
Id. 38.22 § 3(a).
          Family Code section 51.095 governs the admissibility of the statement of a
child. Tex. Fam. Code Ann. § 51.095 (Vernon Supp. 2008). The language in
section 51.095 is substantially the same as that contained in Code of Criminal
Procedure article 38.22 with the exception that the Family Code requires that a
magistrate administer the warnings to the child. See Marsh v. State, 140 S.W.3d 901,
912 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d); see also Tex. Fam. Code
Ann. § 51.095.
          In this case, the parties do not dispute that the detectives did not give appellant
the statutory warnings during his interviews. Here, the pertinent issue is whether the
statements resulted from a custodial interrogation.
          “Custodial interrogation” means “questioning initiated by law enforcement
officers after a person has been taken into custody or otherwise deprived of his
freedom of action in any significant way.” Miranda, 384 U.S. at 444, 86 S. Ct. at
1612. “A person is in ‘custody’ only if, under the circumstances, a reasonable person
would believe that his freedom of movement was restrained to the degree associated
with a formal arrest.” Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)
(citing Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994)). 
          When the person involved is a minor, courts consider his age and all the
circumstances surrounding the interrogation to decide whether there was a formal
arrest or a restraint of movement to the degree associated with formal arrest. Jeffley
v. State, 38 S.W.3d 847, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d); In
re V.P., 55 S.W.3d 25, 31 (Tex. App.—Austin 2001, pet. denied). Stated differently,
the court’s inquiry is whether, based on the objective circumstances, a reasonable
child of the same age would believe his freedom of movement was significantly
restricted. In re D.A.R., 73 S.W.3d 505, 510 (Tex. App.—El Paso 2002, no pet.). 
          Courts make the “custody” determination on a case by case basis by
considering all objective circumstances of the interrogation. Stansbury, 511 U.S. at
323, 114 S. Ct. at 1529; Dowthitt, 931 S.W.2d at 255. The Court of Criminal Appeals
has recognized four factors relevant to determining whether a person is in custody:
(1) probable cause to arrest, (2) subjective intent of the police, (3) focus of the
investigation, and (4) subjective belief of the defendant. Dowthitt, 931 S.W.2d at
254. 
          Subjective intent of law enforcement officials to arrest is not relevant unless
that intent is somehow communicated or otherwise manifested to the suspect. Id.
(citing Stansbury, 511 U.S. at 324–25, 114 S. Ct. at 1529). Further, the mere fact that
an interrogation begins as non-custodial does not prevent custody from arising later;
police conduct during the encounter may cause a consensual inquiry to escalate into
custodial interrogation. Id. at 255.
          The Court of Criminal Appeals has identified at least four general situations
that may constitute custody: (1) when the suspect is physically deprived of his
freedom of action in any significant way; (2) when a law enforcement officer tells the
suspect he cannot leave; (3) when law enforcement officials create a situation that
would lead a reasonable person to believe that his freedom of movement has been
significantly restricted; and (4) when there is probable cause to arrest and law
enforcement officers do not tell the suspect he is free to leave. Id. Concerning the
first three situations, the restriction on freedom of movement must amount to the
degree associated with an arrest as opposed to an investigative detention. Id.
Concerning the fourth situation, the officers’ knowledge of probable cause must be
manifested to the suspect. Id. Such manifestation may occur if information
substantiating probable cause is related by the officers to the suspect or by the suspect
to the officers. Id. 
          In this case, appellant does not dispute that, when it began, the first interview
was non-custodial and voluntary. Rather, appellant claims that the interview quickly
escalated into a custodial interrogation. Appellant asserts that, by the time of his
encounter with the police, the detectives had already focused the investigation on
him. Specifically, appellant points to the cell phone records from the night of murder,
the email to Lorenzo stating that appellant was coming to Lorenzo’s home that night,
and the information obtained from Beana that appellant had admitted to him that he
had killed Lorenzo.
          Appellant contends that the police had probable cause to arrest him and that
such probable cause was manifested to him early in the first interview. Appellant
asserts that such manifestation occurred when, during the first part of the interview,
Detective Harris described to appellant the evidence the police had connecting him
to the murder. Appellant cites Detective Harris’s statements to appellant that other
witnesses had implicated him and that the police had cell phone records showing that
Lorenzo had spoken with appellant several times preceding the murder. 
          Appellant also points to his own initial inculpatory statement as a manifestation
of probable cause. After Detective Harris told appellant what evidence the police had
obtained against him, appellant admitted that he had called Lorenzo to lure him out
of his home to be killed. Appellant contends that “[o]nce he admitted his
involvement, it was apparent that the 16 [sic] year old believed he would be held in
custody.”


 In addition, appellant notes that the trial court found that the police had
probable cause to arrest him at the beginning of the second interview. 
          Appellant does not contend that the manifestation of probable cause alone
escalated the non-custodial interview into a custodial interrogation. Appellant
acknowledges that the Court of Criminal Appeals has instructed courts that “custody
is established if the manifestation of probable cause, combined with other
circumstances, would lead a reasonable person to believe that he is under restraint
to the degree associated with an arrest.” Id. (emphasis added). 
          Appellant contends that “other circumstances” were present during the
interview process that, when combined with the manifestation of probable cause,
would have led a child of his age to believe that he was under arrest. Appellant first
points to the physical conditions in which the interview was conducted as an
indication that the interviews were custodial. Directing us to the videotape of the first
interview, appellant characterizes the interview room as “stark, small, and dimly lit.” 
Appellant points out that Detective Harris testified that the room was eight feet by ten
feet, the room had styrofoam tiles on the wall to make it soundproof, the room’s door
was closed during the interview, and the door had a small window that was covered
during the interview. The room contained one table and two chairs. Appellant also
points out that he was either alone in the room or with the detectives, “without a
parent or lawyer present.” 
          Appellant also characterizes the conduct of the detectives as “coercive.” 
Appellant asserts that the detectives “confronted him with evidence of his presence
at the homicide and witnesses who implicated him as a shooter. It was in this
coercive environment that [appellant] admitted involvement in Lorenzo’s death in the
first interview, which ended an hour later.” 
          Appellant further points out that, during the first interview, he expressed to the
detectives that he believed he would go to jail. Within a few minutes after the taped
portion of the first interview began, appellant remarked, “I’m going to jail eventually,
I’m just going to jail already (inaudible) why you just didn’t tell me.” After he had
admitted to shooting Lorenzo, appellant said to Detective Martinez, “You know that
I was gonna go to jail, eventually right?” And then asked, “But I’m a, I’m a go [sic]
to jail right?” In conjunction with the issue of jail, appellant was quite concerned that
he would be placed in the same facility as the others who participated in the murder.
          Even assuming that probable cause to arrest appellant was manifested early in
the first interview, we disagree that other circumstances existed, in combination with
the probable cause manifestation, that would have led a reasonable 15-year-old to
believe that he was under restraint to the degree associated with an arrest. The parties
agree that appellant was never formally arrested or handcuffed and was driven to the
police station in an unmarked police car by a plain-clothed detective. It is also
undisputed that appellant went voluntarily to the police station with his mother’s
consent. 
          Even if appellant had become the “focus” of the investigation, the Court of
Criminal Appeals has recognized that becoming the focus of the investigation alone
does not equate to custody for purposes of determining whether a statement is
voluntarily given. See Meek v. State, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990). 
As a general rule, when a person voluntarily accompanies law enforcement to a
certain location, even though he knows or should know that law enforcement suspects
that he may have committed or may be implicated in committing a crime, that person
is not restrained or “in custody.” Livingston v. State, 739 S.W.2d 311, 327 (Tex.
Crim. App. 1987). More specifically, if the circumstances show that a person is
acting only on the invitation, request, or even urging of law enforcement, and there
are no threats, either express or implied, that he will be taken forcibly, the
accompaniment is voluntary, and such person is not in custody. Anderson v. State,
932 S.W.2d 502, 505 (Tex. Crim. App. 1996).
          Given the totality of the objective circumstances, the physical aspects of the
interview room also did not convert the interview into a custodial interrogation. See
Garza v. State, 34 S.W.3d 591, 596–98 (Tex. App.—San Antonio 2000, pet. ref’d)
(concluding that interview was non-custodial even though suspect “interviewed in a
small room with the door closed for over five hours”). We note that the videotapes
of appellant’s interviews do not show the room as “dark” and “dimly lit,” as
characterized by appellant. Although the door was closed and the door’s window was
covered, Detective Harris testified that the door was not locked and did not have a
locking mechanism. Moreover, common sense would dictate that police interview
rooms are not overly spacious and may have design features, such as soundproof
walls, to insure the privacy of the interview. 
          Appellant also did not ask to speak to his mother or an attorney at any time
during the interview process. To the contrary, Detective Harris testified that appellant
stated that he did not want his mother in the interview room because he “couldn’t face
her.” 
          Appellant places much significance on his remarks to the police indicating that
he believed that he would go to jail. These remarks, however, when read in context
are not a manifestation of his present subjective belief that he was at the time under
restraint to the degree associated with an arrest. Instead, appellant’s remarks indicate
that he believed that “eventually” he would go to jail; that is, his remarks indicate that
he believed he would go to jail at some future time. The record reflects that appellant
also inquired whether he would eventually go to jail because he feared being housed
in the same facility as one of the other men that participated in the murder. 
          Significantly, throughout the first interview, the detectives told appellant
numerous times that he was not under arrest, he was not in custody, and he was free
to leave. The first video shows that the detectives told appellant he would be walking
out of the police station after the interview. They clarified that, although he could go
home with his mother after the interview, he might be arrested later. Detective
Martinez explained that the district attorney’s office would determine whether
charges would be pursued against him. Detective Harris also offered to take appellant
to see the priest at their church if appellant was interested. At the beginning of the
second interview, Detective Martinez said to appellant, “[Y]ou’re not in custody,
you’re not under arrest, and you’re free to go when we get finished with this right,
you’re free to go now, you understand all of that right?” Appellant responded, “Yes. 
Yes I do.” 
          After the second interview, Detectives Martinez and Gonzales took appellant
to school because his mother had already left with appellant’s brother. The detectives 
then contacted the district attorney’s office, as they had indicated they would, to
determine whether the district attorney would pursue charges against appellant. 
Detective Martinez testified that it was only after the district attorney’s office
indicated that it would “accept charges” against appellant that the detectives initiated
an arrest of appellant at school. 
          The fact that the detectives repeatedly indicated to appellant that he was not
under arrest, was not in custody, and was free to leave distinguishes this case from
other cases in which it was determined that an interrogation was custodial. See, e.g.,
In re D.A.R., 73 S.W.3d at 512 (citing fact that juvenile had never been told he was
free to leave as significant to determination that interrogation was custodial); Jeffley,
38 S.W.2d at 856–57 (concluding that juvenile’s statement resulted from custodial
interrogation, in part, because minor was not informed that she was free to leave). 
This fact also makes this case similar to other cases in which it was determined that
the interrogation was not custodial. See, e.g., Oregon v. Mathiason, 429 U.S. 492,
493–95, 97 S. Ct. 711, 713–14 (1977) (holding interrogation was non-custodial when
facts showed that suspect came to police station voluntarily, was told he was not
under arrest, gave an incriminating confession before being Mirandized, and was
allowed to leave after being told the case would be referred to district attorney for
action); Houston v. State, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref’d)
(determining appellant was not in custody after he had voluntarily gone to police
station, and “the detectives specifically told [him] that he was not under arrest and
implied through their questioning that he could leave”); Garcia v. State, 106 S.W.3d
854, 858–59 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d) (concluding no
custody when suspect “voluntarily went to the police department, and after he was
told that he could leave, he voluntarily gave a videotaped statement”); Garza, 34
S.W.3d at 596–98 (discussing significance of fact that suspect told he was free to
leave in case in which court ultimately determined that interview was not custodial).
          Although they had probable cause to arrest him after he made his confession,
the detectives told appellant that he was free to leave, not in custody, and not under
arrest. Moreover, appellant was taken to school after he made his statements. We
recognize that the express communication by police to appellant that he was free to
leave is not dispositive of the issue of whether he was in custody. See Garza, 34
S.W.3d at 597. Rather, after considering the totality of the circumstances surrounding
appellant’s statements, and giving due deference to the trial court’s determination of
the historical facts, we conclude that the trial court reasonably concluded that a 15-year-old in appellant’s situation would not have considered himself under restraint
to the degree associated with an arrest. The evidence supports the trial court’s finding
that appellant was not in custody when he gave either statement. As a result,
appellant’s Miranda or statutory rights were not triggered. We hold that the trial
court did not abuse its discretion by denying appellant’s request to suppress his
videotaped statements on the ground that he was in custody and not informed of his
rights. 
          We overrule appellant’s first issue.
C.      General Voluntariness and Due Process Considerations
          In his second issue, appellant contends that his recorded statements should
have been suppressed because “they were not voluntarily given.” 
          Under Code of Criminal Procedure article 38.21, “A statement of an accused
may be used in evidence against him if it appears that the same was freely and
voluntarily made without compulsion or persuasion[.]” Tex. Code Crim. Proc.
Ann. art. 38.21 (Vernon 2005). A defendant may claim that his statement was not
freely and voluntarily made and thus may not be used as evidence against him under
several different theories: (1) Code of Criminal Procedure article 38.22, section 6; (2)
Miranda v. Arizona, as expanded in Article 38.22, sections 2 and 3; or (3) the Due
Process Clause of the United States Constitution. Oursbourn v. State, 259 S.W.3d
159, 169 (Tex. Crim. App. 2008).
          Even in the absence of custody, due process may be violated by admitting
confessions that are not voluntarily given. Wolfe v. State, 917 S.W.2d 270, 282 (Tex.
Crim. App. 1996). Similarly, Code of Criminal Procedure article 38.22, section 6
governs the admissibility of an accused’s custodial and non-custodial statements and
provides that only voluntary statements may be admitted. Tex. Code Crim. Proc.
Ann. art. 38.22, § 6 (Vernon 2005); see State v. Terrazas, 4 S.W.3d 720, 727 (Tex.
Crim. App. 1999). 
          A section 6 claim that an accused’s statement was made involuntarily may
include situations involving police overreaching, youth, intoxication, illness or
medication, mental incapacitation, or other disabilities. See Oursbourn, 259 S.W.3d
at 172–73. In contrast, a confession may be involuntary under the Due Process
Clause only when there is police overreaching. Id. at 169. Even if a confession is not
the product of a meaningful choice (for example, when it is made in response to
hallucinations or to a private person’s threat), it is nonetheless “voluntary” within the
meaning of the Due Process Clause, absent some coercive police activity. Id. at
169–70. Whether a statement is voluntary is determined by examining the totality of
the circumstances. Delao v. State, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). 
          Appellant first contends that his statements were involuntary because he was
15 years old and “interrogated by seasoned homicide detectives over the course of
several hours, isolated from his mother, without counsel, and without the benefit of
any procedural safeguards of Miranda and [section] 51.095 of the Family Code.” We
begin by noting that youth is usually not enough, by itself, to render a statement
inadmissible; it is merely a factor to consider in determining the voluntariness of the
confession. See Oursbourn, 259 S.W.3d at 173; see, e.g., Martinez v. State, 131
S.W.3d 22, 35 (Tex. App.—San Antonio 2003, no pet.) (holding that confession of
15-year-old boy with reading, spelling, and math abilities of second or third grader
was voluntary); In re V.M.D., 974 S.W.2d 332, 346 (Tex. App.—San Antonio 1998,
pet. denied) (holding that confession of twelve-year-old girl was voluntary). Nothing
in the record indicates that appellant’s youth rendered him incapable of understanding
the nature of the questioning or the possible repercussions of his answers. Instead,
the record reflects that appellant understood the questions and the implications of
answering them.
          In addition, the trial court found that the two interviews lasted no more than a
total of four hours, and this finding is supported by the record. Although the length
of an interrogation may be a consideration in determining the voluntariness of a
statement, four hours of questioning does not necessarily render a statement
involuntary. This is particularly true in light of the evidence showing that appellant
had been told repeatedly that he could leave, and yet voluntarily chose to continue the
interview. Other courts have held that questioning of much longer durations did not
render a confession involuntary. See, e.g., Smith v. State, 779 S.W.2d 417, 428 (Tex.
Crim. App. 1989) (holding that eight hours of questioning without food did not
render confession involuntary); Bell v. State, 169 S.W.3d 384, 391–92 (Tex.
App.—Fort Worth 2005, pet. ref’d) (holding that eight hours of questioning, while
in handcuffs and leg shackles, did not render confession involuntary when appellant
never indicated he did not want to answer any more questions or that he wanted to
speak to attorney, and never requested food, water, or bathroom breaks). The record
also reflects that appellant was given a restroom break before the second interview
and given a soda to drink at that time.  
          As discussed supra, appellant’s statements were not involuntary because he
had not been informed of his Miranda and statutory rights. Moreover, appellant’s
insinuation that his statements were involuntary because he was “isolated from his
mother” has no support in the record. Appellant’s mother was in the waiting room
at the police station during appellant’s first interview. Appellant was aware that his
mother was waiting. The record shows that appellant did not ask to see his mother
during this time. See Cammon v. State, 672 S.W.2d 845, 849 (Tex. App.—Corpus
Christi 1984, no pet.) (noting that confession was not involuntary because a family
member was not present inasmuch as defendant never requested a family member’s
presence). To the contrary, Detective Harris testified that appellant told him that he
did not want to see his mother. 
          Detective Harris did testify that appellant’s mother asked to be present during
the interview. Detective Harris told her that appellant may not be as candid if she was
present. Ms. Spencer then decided not to be present during the interview, stating that
she was certain that appellant would “do the right thing and tell the truth.” Cf. Mason
v. State, 116 S.W.3d 248, 263 (Tex. App.—Houston [14th Dist.] 2003, pet. ref’d)
(concluding confession was voluntary in case in which adult defendant claimed
statement involuntary because father was denied access to interview; evidence
showed defendant never requested father’s presence and father remained nearby
during interview). Detective Harris also testified that, during the first statement, he
kept appellant’s mother apprised of what appellant was telling the detectives. 
Detective Harris stated that he told Ms. Spencer while she was in the waiting room
that appellant had implicated himself in the murder.
          Appellant also contends that his statements were involuntary because his
mother testified that he suffers from attention deficit hyperactivity disorder (ADHD).
Appellant cites his mother’s testimony indicating that he has “diminished cognitive
functioning.” 
          A statement is not inadmissible simply because a defendant suffers from mental
impairments. See Green v. State, 839 S.W.2d 935, 940 (Tex. App.—Waco 1992, pet
ref’d); see also Casias v. State, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970). 
Evidence of diminished mental capacity is merely one factor to be considered under
the “totality of the circumstances” standard for determining whether a confession is
admissible. Bizarri v. State, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973). The
question is whether appellant’s mental impairment was so severe that he was
incapable of understanding the meaning and effect of his confession. See Green, 839
S.W.2d at 940.
          At trial, appellant’s mother testified regarding how appellant’s ADHD affects
his ability to answer questions. She told the jury, “My experience with [appellant]
was that unless he was asked straightforward yes-and-no questions or simple one-thought process questions, that he does not know how to answer them correctly.” Ms. 
Spencer further testified that appellant “misinterprets questions and he does not
recognize, for example, non-verbals. He does not recognize . . . sarcasm. He does
not recognize a question that has a double meaning.” Ms. Spencer explained that,
whenever there had been a “concern” at appellant’s school, she would always be
present to explain the questions to appellant.
          Texas courts have long upheld confessions made by defendants suffering from
more severe mental impairments than that attributed to appellant. See Harner v.
State, 997 S.W.2d 695, 700 (Tex. App.—Texarkana 1999, no pet.) (involving
defendant who had eighth-grade education, attended special education classes, was
a mental health patient, took medication, and was told he could return to the state
mental health agency if he signed his confession); see also Bell v. State, 582 S.W.2d
800, 808–09 (Tex. Crim. App. 1979) (upholding voluntariness determination in case
in which defendant was mildly mentally retarded and “lacked the capacity to read and
understand certain statements”); Casias, 452 S.W.2d at 488 (holding statement to be
voluntary even though defendant had I.Q. of 68, was retarded, illiterate, at the mental
age of eight to ten, and at the educational level of “approximately second grade”).
          Here, no evidence was presented regarding the degree of appellant’s mental
impairment, other than the anecdotal testimony of appellant’s mother. A review of
the record indicates that appellant’s asserted mental impairments are not of such great
severity that he was “incapable of understanding the meaning and effect of his
confession.” Green, 839 S.W.2d at 940. The record reflects that appellant was told
repeatedly that he was free to leave and that he was not under arrest. Appellant
indicated, at the beginning of the second statement, that he understood he was free
to leave. 
          Appellant responded to the detectives’ questions and appeared to understand
what was being asked. The record reflects that appellant’s responses appropriately
addressed the questions as asked. Appellant also told the detectives that he did not
kill Lorenzo. Appellant explained that he shot Lorenzo in the legs and that it was
Alviso who fired the fatal shots. Such remarks indicate appellant had the ability to
think defensively and to offer a mitigating statement. See Delao v. State, No.
10-05-00323-CR, 2006 WL 3317718, at *3 (Tex. App.—Waco Nov. 15, 2006) (mem.
op., not designated for publication), aff’d, Delao v. State, 235 S.W.3d 235, (Tex.
Crim. App. 2007). These comments, and others made by appellant during the
interview, also indicate appellant’s awareness that confessing may lead to criminal
prosecution. See id. Thus, the record does not show that appellant’s mental
impairments are so severe to prevent him from comprehending the consequences of
his confession. See Green, 839 S.W.2d at 940.
          Ms. Spencer also testified that appellant had not taken his ADHD medication
on the morning he gave his statements. In contrast, Detective Martinez testified that
he saw appellant take his medication. The trial court found Detective Martinez’s
testimony generally to be credible. The trial court was free to believe Detective
Martinez’s testimony and disbelieve that of appellant’s mother. See Ross, 32 S.W.3d
at 855. Without more, we must defer to the trial court’s credibility determination.
          Appellant further contends that the police engaged in trickery and deception
to obtain appellant’s statements. See Alvarado v. State, 912 S.W.2d 199, 211 (Tex.
Crim. App. 1995) (recognizing that statement is not voluntary if there was “official,
coercive conduct of such a nature that any statement obtained thereby was unlikely
to have been the product of an essentially free and unconstrained choice by its
maker”). Appellant asserts that, when they told appellant that he was not under arrest
and would be allowed to leave, the detectives knew that appellant would be arrested
shortly after he was taken to school. Appellant contends that the detectives engaged
in “a carefully orchestrated plan” to obtain appellant’s confession and “to avoid the
constitutional and statutory protections afforded juveniles.” 
          The record does not support appellant’s claim. The record shows that the
detectives explained to appellant that he was not under arrest or in custody at the time
of statements. The detectives explained to appellant that he may be arrested at a later
time. The detectives also explained to appellant that the district attorney would
decide whether he would be charged. Detective Martinez testified that, after
appellant was dropped off at school, he spoke with appellant’s accomplice, Franciso
Alviso. It was after Detective Martinez spoke with Alviso that Detective Gonzales
contacted the district attorney’s office. The detectives initiated the process of
arresting appellant only after the district attorney’s office informed the detectives that
it would pursue charges against appellant. This was consistent with what the
detectives had told appellant during the interview. Consequently, the record lacks
evidence that appellant’s will was overborne as a result of the cited conduct. See
Green v. State, 934 S.W.2d 92, 99–100 (Tex. Crim. App. 1996).
          In sum, the totality of the circumstances support the trial court’s determination 
that appellant’s statements were made voluntarily. Appellant and his mother both
agreed that appellant could be interviewed regarding Lorenzo’s murder. The
detectives told appellant numerous times that he was not under arrest, not in custody,
and was free to leave. Appellant indicated that he understood that he was free to
leave before he gave the second statement. Despite his asserted mental impairments
and his youth, appellant provided answers to the questions posed, formulated a
defensive response, and indicated his awareness that confessing could lead to
punishment. Evidence was presented that appellant had taken his medication before
he made the statements. The interview was not overly long and the record shows that
appellant was given a restroom break and something to drink. Both appellant and his
mother made the choice that appellant’s mother would not be present while appellant
was being interviewed. The record also shows that appellant’s mother was kept
informed of what appellant was telling the detectives. Lastly, the record does not
support appellant’s contention that the police engaged in a ruse to obtain his
confession. 
          Thus, given the totality of the circumstances, the evidence supports the trial
court’s finding that appellant’s statements “were freely and voluntarily given.” We
hold that the trial court did not abuse its discretion when it denied appellant’s request
to suppress his recorded statements. 
          We overrule appellant’s second issue. 
 
General Voluntariness Instruction
          In his third issue, appellant contends that the trial court “erred when it failed
to instruct the jury pursuant to [Code of Criminal Procedure article] 38.22, section 6
that it must disregard [appellant’s] recorded statement unless it finds that it was given
voluntarily.”
          A trial court has the absolute duty to prepare a jury charge that accurately sets
out the law applicable to the case. Oursbourn, 259 S.W.3d at 179; see Tex. Code
Crim. Proc. Ann. art. 36.14 (Vernon 2007). When a statute, such as articles 38.22,
requires an instruction under certain circumstances that instruction is “law applicable
to the case,” and the trial court must instruct the jury of what is required under the
statute. Oursbourn, 259 S.W.3d at 180.
          Article 38.22, section 6, requires that if the issue of voluntariness of a
statement is raised, then the trial judge must (1) make an independent determination
that the statement was made under voluntary conditions and (2) instruct the jurors that
they shall not consider any statement for any purpose unless they believe beyond a
reasonable doubt that the statement was made voluntarily. Tex. Code Crim. Proc.
Ann. art. 38.22, § 6. The Court of Criminal Appeals has concluded that a general
voluntariness instruction under article 38.22, section 6, must be given if, based on the
evidence presented at trial, a reasonable jury could find that the statement was not
voluntary. Vasquez v. State, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007). A
defendant is entitled to a section 6 instruction on voluntariness even if the historical
facts surrounding his confession are undisputed. Id. The Court of Criminal Appeals
has clarified that if the parties raise and litigate a general voluntariness issue before
the trial judge, then a section 6 instruction becomes the law applicable to the case,
and the trial court must give the instruction regardless of whether it has been
specifically requested. Oursbourn, 259 S.W.3d at 176, 180. 
          When an appellant is entitled to a section 6 instruction, but did not request such
instruction, we review the effect of the instruction’s omission under Almanza’s
egregious harm standard. See id. at 182 & n.89 (citing Ellison v. State, 86 S.W.3d
226, 228 (Tex. Crim. App. 2002)); see also Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985). Jury-charge error is egregiously harmful if it affects the very
basis of the case, deprives the defendant of a valuable right, or vitally affects a
defensive theory. Stuhler v. State, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)
(citing Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). “Egregious”
harm is present when the case for conviction was actually made clearly and
significantly more persuasive by the error. See Saunders v. State, 817 S.W.2d 688,
692 (Tex. Crim. App. 1991).
          To conduct an egregious-harm review, we consider the entirety of the jury
charge itself, the evidence, including the contested issues and weight of the probative
evidence, the arguments of counsel, and any other relevant information revealed by
the trial record as a whole. Stuhler, 218 S.W.3d at 719. We place no burden of proof
or persuasion to show egregious harm on either the defendant or the State. See
Warner v. State, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). Before we can find
egregious harm, the record must show that the defendant has suffered actual, rather
than merely theoretical, harm from the jury-charge error. See Almanza, 686 S.W.2d
at 174. We determine whether an appellant suffered egregious harm by analyzing the
impact of the omission of the voluntariness instruction, not by analyzing the impact
of the admission of the evidence. See Ellison, 86 S.W.3d at 228. 
          At trial, appellant advanced two theories of involuntariness. With regard to his
first theory, appellant introduced evidence that he suffers from ADHD, for which he
takes medication. Conflicting evidence was presented whether he had taken his
medication before he gave his statements. Appellant’s mother also testified that
appellant had difficulty understanding and processing questions and that she normally
assists him in a question-answer setting. The undisputed evidence showed that
appellant’s mother was not present during questioning. The defense argued that
appellant’s cognitive deficits exacerbated the effect of appellant not receiving his
Miranda and statutory warnings. 
          With respect to the second theory, appellant offered evidence to show that his
statements were involuntary because he gave them during a custodial interrogation
and without the benefit being afforded his Miranda and statutory rights (referred to
herein as “Miranda violation”). Neither side disputed that appellant had not been
informed of his rights before he gave his statements. Instead, the focal point of this
theory of involuntariness, by both the State and the defense, in presentation of
evidence and in argument, was whether appellant was in custody when he gave his
statements. 
          For purposes of analysis, we will assume that appellant was entitled to a section
6 voluntariness instruction. We will determine whether appellant was egregiously
harmed by the omission of the instruction with regard to appellant’s two theories of
involuntariness. We first observe that the voluntariness of appellant’s statements
under either theory was a contested issue at trial. Evidence was offered related to
both theories of involuntariness, and both sides presented argument to the jury
regarding the voluntariness of appellant’s statements. 
          We have previously recognized the pitfalls of failing to give a section 6
instruction when one is required. On remand in Oursbourn v. State (“Oursbourn II”),
we observed, 
[T]he absence of a section 6 voluntariness instruction may have
communicated to the jury that it had no reason to question the
voluntariness of the confession. At a minimum, the lack of an
instruction made it much less likely that the jury even considered or
deliberated about the voluntariness of the confession; an issue, which,
under the law, it should have considered. 
 
Assuming it considered the voluntariness issue, the jury was
without guidance regarding how to evaluate appellant’s statement. The
jury was unaware that it had to apply a reasonable doubt standard when
determining the voluntariness of appellant’s statement. And, by failing
to give a section 6 “general” voluntariness instruction, the State was
relieved of meeting this burden. Even if it doubted the voluntariness of
appellant’s confession, the jury was also unaware of the effect of an
involuntariness finding; that is, it was unaware that it could not consider
the statement for any purpose if it found the statement to be involuntary. 
As a result, appellant’s voluntariness defense was undercut. 
No. 01-05-00141-CR, 2009 WL 349838, at *5–6 (Tex. App.—Houston [1st Dist.]
Feb. 12, 2009, no pet.) (citations omitted). 
          In Oursbourn II, we held that the appellant had been egregiously harmed by the 
lack of a section 6 instruction and reversed and remanded the case for a new trial. Id.
at *7. The concerns we expressed in Oursbourn, set out above, have application in
this case as well. However, the underlying facts of this case are distinct from those
in Oursbourn II. 
          One important distinction between this case and Oursbourn II is that the jury
charge in this case contains language not present in the Oursbourn charge. Unlike
the charge in Oursbourn II, the jury charge here instructed the jury that “a statement
of a juvenile may be used in evidence against him if it appears that the same was
freely and voluntarily made without compulsion or persuasion.” 
          Regarding appellant’s involuntariness claim based on the alleged Miranda
violation, the effect of receiving no section 6 general voluntariness instruction was
ameliorated by another provision in the charge more specifically tailored to the issue
of whether appellant was in custody when he gave the statements. In a nearly two-page instruction, the jury was directed not to consider appellant’s statements if it
found from the evidence, or had “a reasonable doubt thereof,” that the statements
were a result of custodial interrogation, and appellant had not received the appropriate
statutory warnings. The instruction served to direct the jury to consider the issue of
custody specifically, offered guidance for the standard by which to evaluate the
statements, and provided a mechanism for disregarding the statements. 
          The instruction did not ameliorate the effect of a lack of a section 6 instruction
as it relates to appellant’s involuntariness claim based on his ADHD. However, in
contrast to the custody issue, minimal evidence or argument was offered by appellant
to support his involuntariness claim based on his alleged cognitive impairments
arising from his ADHD. 
          The evidence that was offered regarding appellant’s ADHD was not
overwhelming. The evidence showed that appellant had ADHD and that he took
medication for the disorder. Conflicting evidence was presented regarding whether
appellant had taken his medication the morning he made the statements. No evidence
was presented regarding how appellant was effected by a failure to take his
medication. No expert testimony was given regarding ADHD generally or how it
specifically affected appellant’s ability to give a voluntary statement. The defense
offered the testimony of appellant’s mother regarding her own personal observations
relating to appellant’s ADHD. 
          As mentioned, Ms. Spencer testified that appellant had difficulty answering
question unless they were “straightforward yes-and-no questions or simple one-thought process questions.” Ms. Spencer testified that appellant “misinterprets
questions” and “does not recognize” non-verbal clues, sarcasm, or a question that has
a has “a double meaning.” Ms. Spencer explained that she has helped appellant to
understand questions in the past at school when there has been a conference. 
          Appellant testified at trial, but he did not testify regarding any aspect of his
ADHD. Instead, appellant’s testimony was offered primarily to establish his other
defense: duress. Appellant testified that he shot Lorenzo only because Alviso had
threatened to kill him and his family if he did not participate in the murder.


 This,
along with the custody issue, were the focal points of appellant’s defense at trial.
          In contrast, the primary defense offered in Oursbourn II was the defendant’s
inability to give a voluntary statement because he suffered from bipolar disorder. 
There, unlike this case, a substantial amount of evidence was offered to show how the
defendant’s bipolar disorder affected his ability to voluntarily give a statement.           In this case, the State did rely on appellant’s recorded statements to prove its
case against appellant. However, as stressed by the State in its closing argument,
other evidence also established appellant’s guilt. The other evidence of appellant’s
guilt is substantial and more than sufficient to support his conviction. 
          The State’s leading witness, Miguel Beana, testified that appellant had called
him before the murder and stated that he wanted to kill Lorenzo. Appellant told
Beana that he his “homies” planned to “put a bullet” in Lorenzo’s head. Beana also
testified that appellant had called the morning after the murder. In that conversation,
appellant told Beana that they had killed Lorenzo. Appellant also told Beana that he
had shot Lorenzo in the leg and in the head. Furthermore, the evidence showed that
appellant had spoken on the telephone numerous times with Lorenzo in the time
period leading up to the murder. Such evidence alone was sufficient to support the
jury’s finding of guilt. 
          This aspect of the instant case also stands in contrast to the facts of Oursboun
II. There, the State relied primarily on the defendant’s statement to prove its case. 
The circumstantial evidence relied on by the State in Oursbourn II was somewhat
tenuous and further undermined by the State’s witnesses’ inability to identify the
defendant as the perpetrator. 
          After reviewing the entirety of the jury charge, the evidence, including the
contested issues and weight of the probative evidence, the arguments of counsel, and
other relevant information revealed by the trial record as a whole, we conclude that
the omission of the voluntariness instruction did not deprive appellant of a valuable
right or vitally affect a defensive theory. See Hutch, 922 S.W.2d at 171. The State’s
case for conviction was not made clearly and significantly more persuasive by the
error. See Saunders, 817 S.W.2d at 692. We hold that appellant did not suffer
egregious harm as a result of the omission of the section 6 general voluntariness
instruction.
          We overrule appellant’s third issue.
 

Conclusion
          We affirm the judgment of the trial court.




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Jennings, Alcala, and Higley.

Do not publish. See Tex. R. App. P. 47.2(b).