Juan Cerda GARZA, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–99–00670–CR.

Court of Appeals of Texas,
San Antonio.

Sept. 27, 2000.

Rehearing Overruled Oct. 23, 2000.

Michael R. Latimer, Harkins, Latimer & Dahl, P.C., San Antonio, for Appellant.

Edward F. Shaughnessy, III, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: KAREN ANGELINI, Justice.

Juan Cerda Garza pled *nolo contendere* to murdering his common-law wife and was sentenced to 35 years imprisonment pursuant to a plea bargain. The issue on appeal is whether the trial court erred in denying Garza's motion to suppress his two written statements, which included a confession to the murder.[1] Garza maintains the statements resulted from a custodial interrogation and that he was not given *Miranda* warnings prior to making them. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The State acknowledges Garza never received the warnings, but asserts that because he was not in custody when he made his statements, the *Miranda* requirements were not triggered.

---

1. Garza's plea of *nolo contendere* does not waive his right to complain of error which occurred prior to the plea when the trial court relied on that error in rendering its judgment. *See Young v. State,* 8 S.W.3d 656, 666–67 (Tex.Crim.App.2000).

### a. Custodial Interrogation Defined

█ Unless questioning by law enforcement officials escalates to a custodial interrogation, the requirement to give *Miranda* warnings is not triggered. *See Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. *See also Ruth v. State*, 645 S.W.2d 432, 435 (Tex.Crim.App.1979). The United States Supreme Court has delineated a two part inquiry to determine whether a suspect is in custody:

(1) what were the circumstances surrounding the interrogation, and

(2) under those circumstances would a reasonable person feel he or she was not free to terminate the questioning and leave.

*See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. The first inquiry is a factual determination regarding the circumstances surrounding the interrogation. *See Thompson*, 516 U.S. at 112, 116 S.Ct. 457. On review, we give almost total deference to the trial court's determination of these historical facts. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). The second inquiry is an application of the legal standard to these facts, and is a mixed question of law and fact that does not turn on the evaluation of the witnesses' credibility and demeanor, which we review *de novo*. *See Thompson*, 516 U.S. at 112–13, 116 S.Ct. 457; *Guzman*, 955 S.W.2d at 89; *Loserth v. State*, 963 S.W.2d 770, 772–73 (Tex.Crim.App.1998); *Hunter v. State*, 955 S.W.2d 102, 105 & n. 4 (Tex.Crim.App. 1997) (question of whether appellant was detained under Fourth Amendment a mixed question of law and fact that did not turn on evaluation of credibility and demeanor and reviewed *de novo* ).

█ In *Stansbury*, the Supreme Court made it clear that the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. at 323, 114 S.Ct. 1526. Hence the subjective views of both the officers and the suspect are irrelevant to the question of whether the suspect is in custody, except to the extent those views are manifested by the words or actions of the officers and that manifestation would lead a reasonable person to believe he was not free to leave. *See Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996); *In the Matter of M.R.R.*, 2 S.W.3d 319, 323 (Tex.App.-San Antonio 1999)("The custody determination is based entirely upon objective circumstances.").

The Texas Court of Criminal Appeals has outlined four general situations which may constitute custody:

(1) when the suspect is physically deprived of his freedom of action in any significant way,

(2) when a law enforcement officer tells the suspect that he cannot leave,

(3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and

(4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*See Dowthitt v. State*, 931 S.W.2d at 255. The court added that, in situations (1) through (3), the restraint on freedom must be that associated with an arrest and not simply an investigative detention, and in situation (4), the officers' knowledge of probable cause must be manifested to the suspect, and such manifestation, considered in the totality of the circumstances, would lead a reasonable person to believe he is not free to leave. *See id.*

### b. Circumstances Surrounding Interrogation

■ We now turn to the first part of our two-part inquiry: what were the circumstances surrounding the interrogation? At the hearing on Garza's motion to suppress, the State called three detectives to testify about the circumstances leading up to the acquisition of Garza's confession. In response, Garza testified in his own behalf. At a suppression hearing, the trial court is the sole trier of fact and may choose to believe or disbelieve any or all of a witness's testimony. *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). In reviewing the historical facts, we give deference to the trial court's determination that Garza was not in custody and read the record in the light most favorable to that determination. However, in culling the relevant facts from the record, we must keep in mind that the determination of custody has to be made independently of any evidence of subjective intent on the part of either the defendant or the law enforcement officers. *See Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526; *Dowthitt,* 931 S.W.2d at 254; *M.R.R.,* 2 S.W.3d at 323.

The record reflects that the victim, Veronica Garcia, was Garza's common-law wife with whom he had three children. She was reported as missing by her mother, with whom she usually stayed after she had fights with Garza. Her decomposed body was found on the banks of a creek, within walking distance from her home. She had been strangled to death with her own bra.

When they identified the body, the police went to Garcia's mother's home and notified her family, as well as Garza. The officers then asked several family members, including Garza, to come to the police station for interviews. Instead of taking them to the station right away, the officers returned to pick them up several hours later, around 6:00 p.m. that evening. Detective Matjeka testified at the suppression hearing that they did this as a courtesy, since no one in the family appeared to have access to a car. All the family members agreed to go to the stationhouse with the officers. Garza rode in the back seat of a patrol car, seated between his mother-in-law and sister-in-law.

Once at the stationhouse, the officers decided to question the other family members first, then question Garza. As a result, Garza waited in the homicide division waiting room from 6:15 to 8:00 p.m. Around 8:00 p.m. Garza was taken to an eight by ten foot room with one door and no windows, except for a window on the door. The door was kept closed during the interview process, which lasted until after 1:30 the next morning.

For the first hour and a half, from approximately 8:00 to 9:30 p.m., Garza was questioned by Detective Matjeka. During the questioning, Detective Matjeka showed him photographs of his wife's corpse. This interview resulted in Garza's first written statement, in which he does not confess to the murder. The statement was admitted into evidence. In it Garza reiterated his version of the events leading to Garcia's disappearance. He claimed he and Garcia had an argument, after which she left and never returned. He thought she was at her mother's house, where she typically went when they had arguments. He claimed he did not realize Garcia was missing until the police contacted him in their investigation of the missing person's report made by her mother. Since that time, he claimed, he had devoted himself to looking for Garcia.

At the suppression hearing, Detective Matjeka testified that he promised Garza nothing in return for this statement, and that he did not coerce or threaten him. He asserted Garza was not in custody at that time, and was never in custody until he was arrested the following day. He stated that he told Garza he could leave at any time.

After signing the statement, Garza was asked to wait in the interview room. De-

tective Matjeka went outside and briefly conferred with the detectives who had taken statements from the other family members and, based on that conference, decided to question Garza further. This time, he went into the interview room accompanied by Detective Gonzales.

The second interview lasted an hour and a half, from 9:30 to 11:00 p.m. Prior to beginning the interview, Detective Matjeka told Garza he had more questions for him. He told Garza he was not under arrest, that he did not have to answer their questions, and that the detectives would take him home any time he felt like leaving. Garza agreed to talk to them. Both detectives, Matjeka and Gonzales, testified at the hearing that the second interview was quite intense and confrontational. Detective Matjeka testified he raised his voice during the interview. The detectives accused Garza of lying to them and to Garcia's relatives. They told him they believed he killed Garcia and that they could prove it. They told him that the detective in charge of the missing persons investigation on Garcia said Garza told him he had gone down to the creek looking for Garcia after she left the house that last night, which was contrary to Garza's previous assertion that he did not do this. They attempted to mislead him by telling him they had found a hair from Garza tied in the knot in the item used to strangle Garcia. They attempted to get Garza to tell them what had been used to strangle Garcia, a fact which had not been released to the media by the police. Matjeka testified that Garza never denied he killed Garcia. When confronted with the questions, Garza's repeated response was that he did not remember. The detectives again told him they believed he killed Garcia. At the hearing, Detective Matjeka stated, "When we said that again, [Garza] finally hung his head. I leaned over and I asked him very quietly if he had killed his wife and at that point he nodded his head yes. When I asked him what had happened, he once again said, 'I can't remember,' and he started crying."

At that point, Detective Matjeka and Detective Gonzales left the room for ten minutes. When they returned, they asked Garza to start from the beginning and tell them what happened. Garza stated, "It is hard. I never killed anybody before." He then admitted to having followed Garcia down to the creek when she left the house after their argument. They had another argument at the place where the body was found and Garcia had threatened to leave Garza and take their children from him. Garza admitted that this made him angry and he grabbed her and strangled her. Garza made the motion of strangling Garcia with his hands to demonstrate to the detectives how he did it. However, when asked what he used to strangle her, Garza stated he could not remember and asked the detectives to help him remember by hypnotizing him. The detectives repeatedly tried to get Garza to tell them what he used, to no avail. About 11:00 p.m., Detectives Matjeka and Gonzales ended their interview with Garza. At the suppression hearing, Detective Matjeka reiterated that he never threatened, coerced or promised Garza anything in order to obtain the confession. He asserted that Garza never asked to leave. No written statement was taken in the second interview.

The detectives then tried a different tack. Two new detectives, Rutland and Escobar, entered the room to interview Garza. Detective Rutland testified at the suppression hearing that the door to the interview room was kept closed. He also testified that he told Garza he could leave at any time, and that the detectives did not make any coercions, threats or promises in order to get statements. Detective Rutland stated that the detectives were "persistent" in their questioning of Garza, and that he may have raised his voice at times. He told Garza he believed he had killed his wife and repeatedly asked him what he strangled her with. Eventually Garza confessed to strangling her with her bra, and shortly after midnight Detective Rutland

began typing a second written statement for Garza to sign. He and Detective Escobar had been interrogating Garza for approximately one hour.

It took Detective Rutland approximately an hour and a half to finish typing the second written statement. He stayed in the room with Garza while he typed and Garza narrated. When Garza indicated he was hungry, Detective Matjeka brought him a meal from a fast food restaurant. After midnight, Garza needed to use the restroom at least twice. Each time Detective Rutland took him, and accompanied him inside the restroom, which was approximately 30 feet from the interview room. Detective Rutland testified that he did this once because he had to use the restroom himself, and the other times because persons were not allowed to wander unaccompanied through the stationhouse at night.

Garza's second written statement was admitted in evidence, and states in part, "I know I am not under arrest and can leave any time I want to." When Garza finished reading and signing his second written statement, Detective Matjeka drove him home. It was 2:00 a.m. Garza was never read his rights. The next morning, Detective Matjeka obtained a warrant for his arrest.

### c. Application of Law to Facts

We now turn to the second part of our two part inquiry: given the circumstances surrounding the interrogation, would a reasonable person have felt he was free to leave? We review this mixed question of law and fact *de novo*. *See Thompson,* 516 U.S. at 112–13, 116 S.Ct. 457; *Guzman,* 955 S.W.2d at 89.

■ Before beginning this analysis, we first address the State's argument that we should affirm the trial court's ruling to allow the written confession based on Garza's testimony at the hearing that he only signed the confession because he wanted to go home. The State asserts

that the testimony proves Garza felt he was free to leave and therefore could not have been under arrest. We do not find such testimony to be dispositive. In fact, the testimony is irrelevant. The subjective belief of a defendant cannot be considered when determining whether a defendant was in custody, except to the extent that it is manifested in the words or actions of the investigating officers. *See M.R.R.,* 2 S.W.3d at 323. As explained earlier, the determination must rest on objective factors alone. *See Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526; *Dowthitt,* 931 S.W.2d at 254; *M.R.R.,* 2 S.W.3d at 323. Likewise, Garza's assertion in his written statement that he knew he was not under arrest and could leave anytime he wanted to is also not proper evidence on which to base an objective judicial determination of whether Garza was in custody. *See id.*

In considering the totality of the circumstances surrounding the interrogation, several objective factors tend to show that the interrogation was custodial: Garza went to the stationhouse at the request of police in a police car; he waited an hour and forty-five minutes to be interviewed; he was interviewed in a small room with the door closed for over five hours; he was questioned by four different police officers who repeatedly accused him of killing his wife; he was not allowed to go to the restroom without a police escort; the police told them they found his hair in the object used to strangle his wife; and most importantly, the police had probable cause to arrest Garza when he hung his head and admitted he killed his wife. This probable cause was manifested to Garza when he made the admission. *See Dowthitt,* 931 S.W.2d at 255 ("Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers."). The objective factors tending to show that the interrogation was noncustodial were: Garza went to the stationhouse willingly and voluntarily; Garza never asked to leave, or to see anyone; and he was given

a meal when he asked for food. Most importantly, the officers told Garza at least three different times during the interrogation that he was free to leave at any time, and he was told this after confessing to the killing but before he signed the written statement. Each time he was told that he could leave, he chose to stay and continue the interrogation. In fact he did eventually leave and go home after he signed the second statement.

■ None of these objective factors, taken alone, is dispositive on the question of custody. *See e.g. Dowthitt*, 931 S.W.2d at 255 ("Stationhouse questioning does not, in and of itself, constitute custody," and "probable cause . . . does not automatically establish custody. . . ."); *Parra v. State*, 743 S.W.2d 281, 285 (Tex.App.-San Antonio 1987, pet. ref'd)(presence of coercive aspects in interview of a suspect does not necessarily render it a custodial interrogation). In considering the totality of the circumstances surrounding the interrogation in this case, we must determine whether a reasonable person would have felt he was free to terminate the interrogation and leave. At the time Garza made his first written statement, procured before he orally confessed to the crime, we conclude that he was not in custody. Garza went to the police station voluntarily and engaged in an nonconfrontational interview with Detective Matjeka. The trial court correctly overruled the motion to suppress the first statement.

■ The circumstances that led to the second statement, however, require additional analysis. According to the detectives' testimony at trial, the interrogation became accusatorial after the first statement was obtained. They accused Garza of killing his wife, they accused him of lying to them, and they showed him a hair they said was his hair found in the object used to strangle his wife. Garza had been in the interrogation room for approximately three hours when he admitted to killing his wife. At that time, the detectives had probable cause to arrest him. Instead, the

detectives left the room for ten minutes, then returned and continued the interrogation. The record does not show that the detectives reiterated to Garza that he was free to leave at that time. However, when the second pair of detectives entered the room, they told Garza that he was free to go. Instead of leaving, Garza stayed to answer their questions and eventually gave his second written statement—his confession. In *Dowthitt v. State*, the Court of Criminal Appeals considered a set of facts similar to the ones here. *See Dowthitt*, 931 S.W.2d at 252–57. The defendant in *Dowthitt* confessed during a stationhouse interrogation to being present during a murder. *See id.* at 256. The Court considered whether "a crucial admission could turn a noncustodial encounter into a custodial one," *id.* at 256, and decided that the admission, along with the other factors, compelled a conclusion that the defendant was in custody from that point on. *See id.* at 257. Some other factors considered by the Court were the fifteen hour length of the interrogation and the exercise of police control over the defendant which included accompanying him to the restroom and ignoring his requests to see his wife. *See id. Dowthitt* clearly requires more than just probable cause in order to make an interrogation custodial for *Miranda* purposes; rather, the existence of probable cause must be considered as part of the totality of circumstances. *See Dowthitt*, 931 S.W.2d at 257. *See also Gonzales v. State*, 4 S.W.3d 406, 415 (Tex.App.-Waco 1999, no pet.).

In this case, while the interrogation was confrontational and long, Garza was repeatedly told he was free to leave at any time. This factor distinguishes this case from the otherwise similar facts in *Dowthitt*. While the police did have probable cause to arrest Garza after he made his admission, they told him he was free to go and Garza's decision to stay and continue the interrogation was voluntary. Moreover, Garza was taken home after he signed his statement. We emphasize we

do not find the fact that the police told Garza he was free to leave to be dispositive on the issue of whether Garza was in custody. We only conclude, in carefully considering the totality of the circumstances of this case, and giving deference to the trial court's determination of the historical facts, that a reasonable person in Garza's situation would have considered himself free to terminate the interview and leave. We conclude the interrogation was not custodial, and hence Garza's *Miranda* rights were not triggered. The trial court correctly overruled Garza's motion to suppress his second statement.

Garza also argues that his Fourth Amendment rights were violated when the police conducted a custodial interrogation without probable cause to arrest him. Because we concluded that Garza was not in custody at the time he was questioned, this argument does not have merit.

Garza's sole issue that the trial court erred in denying his motion to suppress his statements is overruled and the judgment of the trial court is affirmed.