

# IN THE
# TENTH COURT OF APPEALS

### No. 10-14-00302-CR

**ROBERTO CARDIEL HERNANDEZ,**

                                                            **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                            **Appellee**

**From the 40th District Court
Ellis County, Texas
Trial Court No. 37743CR**

## MEMORANDUM  OPINION

A jury convicted Appellant Roberto Cardiel Hernandez of felony driving while intoxicated and assessed his punishment at ten years' incarceration and a $10,000 fine. The jury, however, also recommended that the imposition of Hernandez's punishment be suspended and that he be placed on community supervision. The trial court suspended the sentence and placed Hernandez on community supervision for ten years, but Hernandez was ordered to spend 180 days in jail as a condition of his community

supervision.  Hernandez presents one issue (in multiple subparts)—the trial court erred in denying his motion to suppress.  We will affirm.

A trial court's ruling on a motion to suppress is evaluated under a "bifurcated standard of review."  *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016).

> First, we afford almost total deference to a trial judge's determination of historical facts.  The judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony. . . .  Second, we review a judge's application of the law to the facts *de novo.*  We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case.

*Id.*  (footnoted citations omitted); s*ee also Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016) (footnoted citations omitted).  When the trial court makes explicit fact findings, the reviewing court determines whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings.  *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  The trial court's legal ruling is then reviewed *de novo* unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  *Id*. at 818.  We also give due deference to the trial court's ruling on mixed questions of law and fact "if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor."  *Williams v. State*, 257 S.W.3d 426, 432 (Tex. App.—Austin 2008, pet. ref'd).  As noted, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony.  *Id*.  The trial court "may choose to believe or disbelieve any or all of a witness's testimony."  *Garza v. State*, 34 S.W.3d 591,

594 (Tex. App.—San Antonio 2000, pet. ref'd); *see also Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

The trial court held a hearing on Hernandez's motion to suppress all of the evidence seized in this case, including the blood evidence. The trial court denied the motion and entered findings of fact and conclusions of law. The evidence presented at the hearing included the testimony of two witnesses—Sergeant Adam C. Sowder, III and Deputy Hunter Barnes of the Ellis County Sheriff's Office. Both testified that they had a number of years' experience as law enforcement officers, including experience in identifying intoxicated drivers. Barnes testified that on his way to work on September 29, 2012, at approximately 5:20 a.m., he observed a pickup traveling northbound in the southbound lane of Highway 77. The pickup almost struck an oncoming SUV. Barnes testified that he suspected the driver of the pickup, later identified as Hernandez, was intoxicated or under the influence of something. Barnes stated that he was in his personal vehicle and used his cell phone to call Sowder, who was in charge of the shift change at the sheriff's office. Barnes explained the situation to Sowder, who agreed to intercept the pickup. Barnes testified that he stayed on the line with Sowder while continuing to follow the pickup, which had eventually moved back into the northbound lane. Barnes followed the pickup for eleven miles and noted the following:

> It would speed up, slow down, go to the right almost in the ditch, back across to the southbound lane, speed up, slow down, sudden . . . like maybe stopping then continuing to go. At one point I thought he may wreck. Ran a stop sign at the Gannaway bridge.

Barnes also noted that it rained throughout his contact with the erratically driven pickup, heavily at times. Barnes testified that he backed off from following Hernandez's pickup when Sowder caught up to him. Barnes testified that he pulled up behind Sowder's vehicle after Sowder had stopped Hernandez. Barnes intended to stay with Sowder as backup until Sowder told him he was clear to go.

Barnes noted that the pickup stopped on a bridge, which would have been unsafe even without the heavy rain. Sowder testified that it was a two-lane, narrow bridge with no shoulder. Barnes stated that he did not communicate with Hernandez but that he did see Hernandez when Hernandez exited the pickup. In describing Hernandez's demeanor, Barnes testified that Hernandez was "slouchy" and disoriented, not knowing where he was. Barnes further testified that he observed the odor of an alcoholic beverage coming from Hernandez. While Sowder conducted a field sobriety test, Barnes directed traffic around the stopped vehicles.

Sowder testified that he turned on the overhead lights on his patrol car when he pulled behind Hernandez's pickup, intending for Hernandez to stop before reaching the bridge. Once Hernandez stopped on the bridge, Sowder attempted to get Hernandez to go forward off the bridge, but Hernandez did not comply. Sowder further testified that he did not see Hernandez commit any traffic infractions or drive erratically until Hernandez's vehicle bumped into the curb on the bridge when stopping. Sowder then approached the driver to check his license and insurance information. Sowder testified

that Hernandez went through the cards in his wallet and passed over the driver's license a number of times before Sowder pointed it out to him. Sowder noted that there was a strong odor of some sort of alcoholic beverage coming from the vehicle and that Hernandez had bloodshot eyes. Sowder requested that Hernandez exit the vehicle, and Sowder noted the following:

> A. His clothes were kind of -- kind of messed up. As we were going to the back I could smell the alcohol now coming off his person as he was walking towards the back.

> Q. Was there anything unusual about the way that he was walking?

> A. He kind of stumbled. You know, kind of a stumbled walk, you know, like if he was using his hands to put on the truck as he -- for balance as he was walking back to the back of his vehicle.

> Q. Do you recall if he was standing up straight or if he was standing in another manner?

> A. I don't recall if he was standing up straight or not. I want to say he was kind of leaning on the truck, the back of the truck as he were [*sic*] standing, the back of his vehicle.

Sowder testified that Hernandez said he did not speak English very well. Both Sowder and Barnes testified that they did not speak Spanish very well. Sowder began to administer the horizontal gaze nystagmus test, but the lack of communication made it difficult, even with Barnes's assistance. Sowder testified that Hernandez exhibited six "clues" on the HGN, indicating that he was intoxicated. Sowder further testified that he did not attempt to administer any other field sobriety tests because it had started raining

heavily and their location on the bridge made it too dangerous to remain there. Also, the surface of the bridge was uneven and could have impacted Hernandez's ability to successfully complete the remaining tests. Sowder testified that he decided to take Hernandez into custody for suspicion of driving while intoxicated based upon the erratic driving reported by Barnes, the smell of alcohol coming from Hernandez, the bloodshot eyes, the results of the HGN test, and the fact that Hernandez hit the curb when pulling over. Sowder informed Hernandez that he was under arrest, handcuffed Hernandez, and placed Hernandez in the back of his patrol vehicle. Sowder testified that he planned to take Hernandez to the jail so that Sowder could complete additional sobriety tests out of the rain. Sowder told Barnes to go ahead and leave.

After Barnes departed, Sowder was alone with Hernandez. Sowder testified that before he could transport Hernandez to the jail, Sowder had to call and wait for a wrecker to remove the pickup from the bridge. While they were waiting for the wrecker, Sowder initiated the "DIC-24" recording in Spanish for Hernandez. Sowder stated that the recording is part of the "Leaders" program the sheriff's office used in DWI cases. The recording explains an arrestee's rights, including the right to refuse to submit to a breath or blood test and the consequences of that refusal. Sowder testified that after the tow truck removed Hernandez's pickup, Sowder drove Hernandez to the jail. Sowder called the jail while he was in route and requested that someone meet him to help interpret. During the drive to the jail, Hernandez said a couple of times that he was "not so bad" or

"not much drunk." A Spanish-speaking jail trustee met Sowder at the jail and interpreted the instructions Sowder gave to Hernandez to complete the sobriety tests. Sowder testified that Hernandez exhibited at least three clues indicating impairment on each of the tests he was given at the jail—the walk-and-turn and the one-leg stand. He further testified that the scoring used in the Leaders program considered two clues to be indicative of intoxication.

Sowder testified that after completion of the sobriety tests, he returned Hernandez to the patrol vehicle to play the DIC-24 recording for him again. When Sowder showed Hernandez the written warnings, the trustee told Sowder that Hernandez said he could not read in English and not very well in Spanish. Sowder told Hernandez through the trustee that if he did not agree to the administration of a breath test, Sowder would get a warrant to take his blood. Hernandez did not agree to the test. Sowder then took Hernandez into the jail to complete the booking process, where he discovered that Hernandez had two prior DWI convictions. Sowder testified that he believed the Transportation Code did not require a warrant to draw blood in that circumstance, so he did not complete the warrant application process. Sowder stated that he then retrieved a blood draw kit and took Hernandez to the jail nurse for a blood draw. Sowder's report indicated that Hernandez's blood was drawn at 7 a.m. Sowder explained the process that was required for obtaining a warrant on the day of Hernandez's arrest. He testified that the Leaders program assists in filling out the paperwork necessary to complete a search

warrant application.  "If you start from page one in Leaders and you go to the end, you get a warrant, you get an affidavit, you get a return as well."  Sowder testified that after the application was completed, the officer would contact dispatch to contact a judge to review the application.  Dispatch would go down the list of judges until one answered.  If no judge answered or called back, dispatch would go through the list two more times.  If a judge was located, the officer would have to take the warrant application to the judge, wherever he or she was located.  If the judge signed off on the warrant, the officer would then execute the warrant.  Sowder testified that there had been occasions in the past when dispatch was unable to locate a judge.  Sowder additionally testified that with the procedures in effect at the time of Hernandez's arrest, locating a judge to sign a warrant would have taken an hour to an hour and a half.

**Discussion**

Hernandez contends that the trial court erred in denying his motion to suppress all the evidence seized in this case, including the blood evidence, because:  (1) Sowder admitted he did not try to obtain a warrant for Hernandez's blood; (2) there were no exigent circumstances justifying the warrantless blood draw; (3) Sowder had no probable cause to arrest Hernandez; (4) the trial court's denial of his motion to suppress is not correct on any theory of law; (5) the good-faith exception does not apply; (6) the holding in *McNeely* applies because it was decided while this case was still pending; and (7) Hernandez was harmed by the trial court's error of denying the motion to suppress.  The

State first responds that Hernandez waived any complaint regarding the blood evidence by affirmatively stating "no objection" when the evidence was offered at trial. However, we need not address the State's waiver argument. Even if we assume that Hernandez did not waive his complaint regarding the blood evidence, we conclude that the trial court did not err in denying Hernandez's motion to suppress.

**Probable Cause to Arrest**. Under the Fourth Amendment, a warrantless arrest is unreasonable *per se* unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984)); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). One of those exceptions is when the arresting officer has "probable cause to believe that the suspect has committed or is committing an offense." *Virginia v. Moore*, 553 U.S. 164, 173, 128 S.Ct. 1598, 1605, 170 L.Ed.2d 559 (2008); *Torres*, 182 S.W.3d at 901. Under Texas law, the warrantless arrest must also fall within one of the exceptions specified in articles 14.01 through 14.04 of the Code of Criminal Procedure. *Stull v. State*, 772 S.W.2d 449, 451 (Tex. Crim. App. 1989); *see also Green v. State*, No. 10-12-00308-CR, 2014 WL 2946274, at *6 (Tex. App.—Waco Jun. 26, 2014, pet. ref'd) (mem. op., not designated for publication).

Probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge or of which he has reasonably trustworthy information are sufficient to warrant a reasonable belief that the

person arrested had committed or was committing an offense. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *Torres*, 182 S.W.3d at 901. A finding of probable cause necessitates more than bare suspicion but less than would justify a conviction. *Amador*, 275 S.W.3d at 878. The test for probable cause is an objective one; it is unrelated to the subjective beliefs of the arresting officer and it requires a consideration of the totality of the circumstances facing the arresting officer. *Id*.

The record reflects that Sowder had probable cause to believe that Hernandez was operating a motor vehicle while intoxicated as a result of his own observations and the information provided by Barnes. Hernandez was driving erratically and in the wrong lane, almost hit another vehicle, smelled of alcohol, had bloodshot eyes, had unsteady balance, and appeared to be unaware of his location. He also failed to pass the sobriety test conducted by Sowder.

Considering the totality of the circumstances surrounding Hernandez's arrest, we conclude that the arresting officer had sufficient personal knowledge and trustworthy information at the scene to form a reasonable belief that Hernandez committed the offense of DWI. Contrary to Hernandez's assertion, there was probable cause to arrest Hernandez for DWI even before he was taken to the jail to perform further field-sobriety tests and to submit to a blood test. *See Mullen-Briand v. State*, No. 14-15-00730-CR, 2017 WL 391049, at *3 (Tex. App.—Houston [14th Dist.] Jan. 26, 2017, no pet.) (mem. op., not designated for publication).

We conclude that the evidence, when viewed in the light most favorable to the trial court's ruling, supports the trial court's findings of fact. We further conclude after a *de novo* review that the trial court did not err in determining there was probable cause for Hernandez's arrest.

**Harmless Error**. Assuming without deciding that there were no exigent circumstances justifying the warrantless blood draw in this case, we conclude that the admission of the blood evidence at trial constituted harmless error.

The admission of evidence that is obtained in violation of the Fourth Amendment is subject to the harm analysis set out in Texas Rule of Appellate Procedure 44.2(a) and requires reversal unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011); *see also Chung v. State*, 475 S.W.3d 378, 388 (Tex. App.—Waco 2014, pet. ref'd). "An analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether beyond a reasonable doubt the error did not contribute to the conviction or punishment." *Chung*, 475 S.W.3d at 388.

Although the blood evidence was an integral part of the trial, having been introduced by an expert witness and argued at closing, it was not the only evidence that supported Hernandez's conviction. The testimony of Sowder and Barnes established that Hernandez was so impaired that he was driving erratically, swerving from side to side,

and he was driving on the wrong side of the road, at which time he almost hit another vehicle. Hernandez also ran a stop sign and bumped into the curb when Sowder finally got him to pull over. The officers observed that Hernandez was disheveled, unsteady on his feet, disoriented, and smelled of alcohol. Hernandez's eyes were glassy and bloodshot, and he fumbled through his wallet unable to find his driver's license until Sowder pointed it out to him. Sowder also noted that the "clues" exhibited when Hernandez was administered field sobriety tests indicated that Hernandez was intoxicated. Hernandez also admitted that he was drunk, although he believed he was "not so bad" or "not much drunk." Finally, the blood evidence did not have an effect on the jury as it recommended community supervision. We conclude that, beyond a reasonable doubt, the introduction of the blood evidence did not contribute to Hernandez's conviction or punishment.

In light of the foregoing, Hernandez's sole issue is overruled, and we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed March 28, 2018
Do not publish
[CR25]

