

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-18-00147-CR

---

CAMERON MILES, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. F17-418-158

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

A Denton County jury convicted Cameron Miles on three counts of sexual assault of a child.[1] For the first offense, Miles was sentenced to ten years' imprisonment and ordered to pay a $10,000.00 fine. For the second offense, Miles was sentenced to twelve years' imprisonment and ordered to pay a $10,000.00 fine. And for the third offense, Miles was sentenced to twenty years' imprisonment and ordered to pay a $10,000.00 fine. On appeal, Miles contends the trial court erred (1) in denying his motion to suppress and (2) by admitting a photograph of him into evidence during the punishment phase at trial.

Because we find (1) that Miles was not in custody when he was interviewed by Denton[2] law enforcement officers and (2) that the trial court did not err in admitting the photograph into evidence during the punishment phase at trial, we affirm the trial court's judgment.

## I. Factual Background

Elinor[3] was sixteen years old working at a local Subway sandwich shop. During one shift, Miles, a twenty-eight-year-old assistant manager, made several inappropriate and suggestive comments to her, even though he knew she was under seventeen. Later that night, when the two left the restaurant after closing, Miles followed Elinor to her car. Miles asked about all the things he had said earlier that he would like to do to her. Elinor said she thought he was joking. He then

---

[1]*See* TEX. PENAL CODE ANN. § 22.011 (West 2019).

[2]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Second Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[3]In this opinion, we refer to the child victim by a pseudonym to protect the child's identity. *See* TEX. R. APP. P. 9.10.

put her in the back seat and forced her to engage in sexual intercourse.[4] Elinor was frightened and claimed she "felt frozen like [she] couldn't do anything," "zone[d] out," and did not resist.[5] A few hours after Elinor got home, she told her parents about the assault. Her parents immediately called the police.

A sexual assault investigation began. About four or five days after the assault, two Denton Police Department detectives interviewed Miles at his apartment for about an hour. Following the interview, a warrant for Miles' arrest was obtained the next day. Miles was arrested twenty days later.

Miles moved to suppress any evidence gained from the interview. After a hearing on the motion to suppress, the trial court denied the motion.

## II. Miles Was Not in Custody

In his first point of error, Miles claims the trial court erred in denying his motion. Miles argues that, when detectives came to his apartment to interview him about the assault, Miles was effectively in custody. Miles would have this Court find that the detectives' failure to advise him of his *Miranda*[6] rights rendered inadmissible any evidence produced in the interview. We must

---

[4]Miles was indicted on four counts of sexual assault of a child. The jury convicted him for three acts: Miles' digital penetration of Elinor's sexual organ; contacting Elinor's sexual organ with Miles' sexual organ; and contacting Elinor's anus with Miles' sexual organ.

[5]Elinor said that, when she began to cry, she covered her face because she did not want Miles to see her cry. She testified, "At that point, I just wanted to be happier, so I wasn't there anymore. I was - - I saw - - like just thinking about my sister actually." During the acts, Elinor said Miles called her "a good little girl." When he left her vehicle, he said, "[Y]ou should let me f--- you more often."

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

3

first decide the threshold matter of whether Miles was legally in custody at the time. If not, *Miranda* warnings were not required.

## A. Standard of Review

"[T]he trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses' and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) (citations omitted); *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see Bizzarri v. State*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973). Thus, in reviewing the trial court's factual determination of the circumstances surrounding the interrogation, we give almost total deference to the trial court. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). That said, because whether a reasonable person would feel that he was not free to end the questioning and leave is a mixed question of law and fact that does not depend on the trial court's credibility determination, we employ a de novo standard when evaluating this question. *Thompson v. Keohane*, 516 U.S. 99, 113–14 (1995); *State v. Saenz*, 411 S.W.3d 488, 490 (Tex. Crim. App. 2013).

As a reviewing court, we must defer to "a trial judge's findings of historical fact, as long as they find support within the record." *State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018). "This is because, on matters of historical fact, the trial judge is in 'an appreciably better position than the appellate court' to settle disputes." *Id*. (quoting *Guzman v. State*, 955 S.W.2d 85, 88 (Tex. Crim. App. 1997)). "Such findings are also typically considered to be highly relevant to deciding Fourth-Amendment issues." *Id*.

**B.      Analysis**

The warnings required by *Miranda* are triggered when a person undergoes custodial interrogation or, in other words, the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007).  One is in custody, for these purposes, "only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  In *Dowthitt*, the Texas Court of Criminal Appeals suggested four scenarios in which a person might be considered in custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave.

*Id.* at 255.  "[T]he restriction upon freedom of movement [in situations one through three] must amount to the degree associated with an arrest as opposed to an investigative detention."  *Id*.  "[T]he custody determination is based entirely upon the objective circumstances"; the subjective intents of the law enforcement officer and of the defendant are "irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials."  *Id*. at 254.

In *Thompson*, the United States Supreme Court clarified the factors for determining whether a suspect is in custody.  The matter turns on (1) a factual determination of the circumstances surrounding the interrogation and (2) a legal determination of whether, under the factual circumstances, a reasonable person would feel that he was not free to end the questioning

5

and leave. *Thompson*, 516 U.S. at 112–13. "'[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam))).

Miles contends that he was in custody under the fourth scenario described in *Dowthitt*. Under this fourth scenario of custody, the manifestation of probable cause does not automatically establish custody. "Rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.2d at 255. According to Miles, Detective Scott Salazar "manifested his knowledge of probable cause to arrest" Miles by telling him, falsely, that Salazar had seen surveillance footage of the parking lot where Miles sexually assaulted Elinor. Miles also points to statements by Salazar that he thought Elinor had given a "really good interview" and that he believed a sexual encounter between Miles and the sixteen-year-old had in fact occurred. Because neither Salazar nor the other detective told Miles he was free to leave, Miles claims he was effectively in custody.

### 1.     The Interview in Miles' Apartment

Salazar wore a body camera and recorded his interview with Miles, so we can review the conversation and tone of the participants in reviewing Salazar's conduct vis-à-vis the custodial status of Miles. Salazar and another detective knocked on Miles' apartment door about 8:30 a.m. Miles did not seem reluctant to speak to the detectives; he simply asked for a moment to get

6

dressed. When officers asked to come in and talk, Miles welcomed them and said he had been expecting them. Salazar asked why he would be expecting them, and Miles said because of what happened at his work. Once the detectives and Miles sat down, Miles spoke, uninterrupted, for several minutes, generally about Elinor, events since the attack, and things Miles had heard about Elinor's condition. At one point, Salazar asked Miles' girlfriend to leave the room so they could talk. Salazar then asked Miles about his version of events. Miles denied having sex with Elinor or even getting in her vehicle.

As the interview progressed, Salazar explained that he had seen surveillance footage of the parking lot where Elinor was assaulted in her vehicle.[7] After about twenty minutes, Miles admitted that he got in Elinor's vehicle to tie his shoe. Salazar then asked Miles about the shadows he had "seen" on the non-existent surveillance footage. Salazar claimed that he saw two shadows, then one, in Elinor's car. This led Salazar to believe that either Elinor got on top of Miles or Miles got on top of Elinor. Miles first denied contact with Elinor, but then claimed she climbed on top of his lap. Gradually, Miles acknowledged sexual contact and then intercourse with Elinor.

---

[7]This was not true. No surveillance footage from the Subway restaurant's interior or any of the businesses with exterior cameras of the parking lot was obtained. Salazar also suggested to Miles that law enforcement had found Miles' DNA at the scene. While DNA consistent with Miles (or a brother, son, or his father) was found in Elinor's panties, this result was not known until the laboratory report generated in April 2018, about a year and a half after the crime. Deception by law enforcement agents is not impermissible. "[I]t is well established that lying about the state of the evidence is not the sort of 'overreaching' that implicates the Due Process Clause, as long as the subterfuge used is not one likely to produce an untrue statement." *Oursbourn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008); *see Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969) (refusing to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily); *Snow v. State*, 721 S.W.2d 943, 946 (Tex. App.—Houston [1st Dist.] 1986, no pet.) ("voluntariness is not destroyed, and a confession induced by deception or trickery is not inadmissible, unless the method used was calculated to produce an untruthful confession or was offensive to due process").

Salazar then suggested that maybe Elinor had been smitten with Miles and that she had instigated the sexual activities. Miles agreed with that version. He said she reached her hand into his pants, then put his hand in hers. When asked if Elinor put Miles' finger in her vagina, he said he did not think so. Miles told Salazar that, at that point, he pushed Elinor off him and left her vehicle.

Salazar kept questioning Miles, who gradually made more specific and clarifying admissions. Salazar eventually explained that he believed Miles had forced the sexual encounter upon Elinor. Miles denied the coital and post-coital statements attributed to him by Elinor. Miles finally asked to speak to an attorney, and Salazar immediately terminated the interview.

### 2. Trial Court's Findings

"The trial court [is] obligated to make findings [of fact] that [are] adequate for the appellate court to decide the legal determinations in the case." *Saenz*, 411 S.W.3d at 495. Here, the trial court made the following findings of fact:

1. The detectives "knocked on [Miles'] door" at his "personal residence";

2. Miles told the detectives "[b]efore questioning started" that "he knew why the officers were there and was waiting for them";

3. He was questioned "in the living room of his own home with a view of windows and doors leading to the outside";

4. Miles agreed to speak to the detectives;

5. Miles asked to end the interview after about an hour;

6. Miles was of "sound mind at the time of the questioning" and "not intoxicated, ill, or suffering from a mental illness such that he was unable to comprehend the officer's questioning at the time or contemplate the voluntariness of his answers to police questioning";

8

7. The detectives "never restricted [Miles'] movements" or "used physical force, threats of physical force, or a showing of force when speaking with" Miles;

8. The detectives never told Miles he was under arrest, did not arrest him, and left his apartment; and

9. A warrant was obtained the next day, but Miles was not arrested until twenty-one days later.

The trial court then concluded that Miles was not in custody when he was interviewed "because under the circumstances a reasonable person would not have believed that his freedom of movement was restrained to the degree associated with a formal arrest." The trial court's findings of fact are supported by the record—including the recording of the interview. Thus, we defer to them.

Miles also contends that Salazar communicated that he had probable cause to arrest Miles. Detective Salazar never explicitly told Miles that he was a prime suspect or focus of the investigation. Even so, by the end of the interview, Salazar told Miles that he believed Miles had forced the sexual event upon Elinor and knew his conduct was wrong. Miles effectively confessed to at least one act of sexual assault of a child after admitting he contacted Elinor's vagina with his penis while and knowing she was sixteen years old. But "the mere fact that the suspect becomes the focus of a criminal investigation does not convert [an investigation] into an arrest." *State v. Stevenson*, 958 S.W.2d 824, 829 (Tex. Crim. App. 1997).[8] Indeed, even

> where a person voluntarily accompanies investigating police officers to a certain
> location, and he knows or should know that the police officers suspect that he may

---

[8]Stevenson and his wife were in a one-car accident. The couple first told the investigating officer Mrs. Stevenson had been driving. The officer noticed evidence contradicting that statement. On the second ask, Stevenson admitted he had been driving. The Texas Court of Criminal Appeals held that Stevenson was not in custody at the time of the statement.

have committed or may be implicated in committing a crime, that person is not 'restrained' or 'in custody' as contemplated by Art. 15.22, . . . so that his Fourth Amendment or Art. I, § 9 rights are implicated.

*Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987).[9]

At no time did either detective tell Miles that he was under arrest or that he was not free to leave. In fact, Miles was in his own residence throughout the interview. When the detectives arrived, Miles said he was eager to speak with them and had been waiting for them. He explicitly said he wanted to speak to the officers when Salazar pointedly asked him that question. He and Salazar sat next to each other on the couch. Salazar's body-camera recording shows the men sitting perhaps a foot or two apart. About eighteen minutes into the interview, Salazar moved to an ottoman directly in front of Miles. Then, Salazar was about two feet across from Miles. The detective leaned in toward Miles, but at no time during the interview was Salazar closer than a couple of feet. Several times Miles chuckled or laughed and claimed he was not nervous. At one point, Salazar told Miles that they would soon be done with their questions, then would leave so Miles could go about his day. When Miles said he would like to have an attorney with him, the interview immediately ended, and the detectives left Miles' residence. *See Beckwith v. U.S.*, 425 U.S. 341, 347 (1976) (holding defendant who was interviewed by IRS agents in a private home and whose "tax liability . . . was under scrutiny . . . hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding").

---

[9]That said, probable cause is manifested when a suspect acknowledges criminal conduct, such as making a confession. *See Ard v. State*, 418 S.W.3d 256, 262–63 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Probable cause was not manifested until Ard confessed; she was immediately arrested, and then she was in custody.

10

### 3. The Suppression Hearing

The trial court also could weigh the contents of the recorded interview against Miles' credibility at the suppression hearing. Miles testified first and told the court he was "scared" when Salazar asked his girlfriend to leave the room. Miles stated he felt the detective got in his "personal space" when the detective moved to sit closer to and directly opposite him. When Salazar moved to sit directly across from him, Miles, seated on the couch in his own apartment, stated that he felt "like [he] was getting arrested at that point." He continued, "[I was] scared like I was backed up into a corner like a dog."[10] He felt Salazar "was lying about everything" when the detective told him that he had DNA samples and surveillance footage from the parking lot. Miles told the trial court that he felt compelled to tell Salazar "what he wanted to hear" "so [he] could get it over with." He also believed that he was in custody.

Miles described Salazar as wearing a "suit" and stated that the other detective "looked like he was all ready for a gun battle, had every kind of gun on him, handcuffs, everything." However, these descriptions were belied by Salazar's body-camera recording, and on cross-examination, Miles conceded that both detectives were in khaki pants and short-sleeved Polo shirts. Additionally, Miles agreed that he told the officers he had been expecting them. Miles also confirmed that Salazar did not draw a weapon, threaten him with violence, handcuff him, promise any benefits for what he told the detective, or arrest him.

---

[10]From the recording of the interview, Salazar sat next to Miles, within a foot or less. When he moved to sit on an ottoman across from Miles, he was a similar distance away, if not a bit farther.

11

Whether consciously or not, Miles made an inculpatory admission in the course of his interview with Salazar. Even so, "[a]lthough a reasonable person would have realized the incriminating nature of [his] admission, no other factors indicating police control over [Miles] existed to lead a reasonable person to believe that he was under arrest." *Wilson v. State*, 442 S.W.3d 779, 786 (Tex. App.—Fort Worth 2014, pet. ref'd) (holding "[p]robable cause alone does not automatically establish custody; other circumstances must also combine to lead a reasonable person to believe that he is not free to leave and is under arrest"). Miles voluntarily made the admission while in the comfort and safety of his own apartment, and he was free to suspend the interview at any time.

Other than *Beckwith*, other cases we have found which contemplate whether one was in custody involve police department or jailhouse questioning. For example, in *Garza v. State*, 34 S.W.3d 591 (Tex. App.—San Antonio 2000, pet. ref'd), the defendant voluntarily accompanied law enforcement to the police station. *Id.* at 594. The questioning then lasted about four hours. *Id*. Garza was questioned by several different officers, who accused him of murdering his wife. Garza gave two statements, the second confessing to the murder. Yet, he never asked to leave the station. He was told at least three times during the interrogation that he was free to leave at any time, and he was told this after confessing to the killing, but before signing the written statement. *Id*. at 596–97. After signing a written version of his confession, he was taken home. *Id*. at 597. The Court of Appeals agreed with the trial court that "a reasonable person in Garza's situation would have considered himself free to terminate the interview and leave" and that "the interrogation was not custodial." *Id*. at 598.

12

Similarly, in *Ervin v. State*, 333 S.W.3d 187 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), the suspect voluntarily went to the police station with officers and gave them her car keys and car to be searched. *Id.* at 205–06. She was taken to the station in a marked police car, because no unmarked vehicles were available. *Id.* at 207. She was not handcuffed, and the detective testified she would have been allowed to leave if she had asked. *Id.* at 206–07. She was also told by a detective that "she was not under arrest and she was free to go anytime she wanted to." *Id.* at 207. Over questioning lasting about four hours, Ervin gave two written statements. In the second statement, she acknowledged being the driver in the capital murder being investigated. *Id.* at 211. Although probable cause then arose to arrest Ervin, she was still allowed to go home. *Id.* Ervin's statements were held to be non-custodial. *Id.* at 211–12.

Based on the record before us, we find Miles was not in custody when Detective Salazar interviewed him. Given the circumstances, *Miranda* warnings were not required. As a result, we overrule Miles' first point of error.

## III.   No Error in Admission of Photograph of Miles at Punishment

Miles next complains that the trial court erred in admitting into evidence, in the punishment phase, a nude "selfie" or photograph that Miles took of himself in a bathroom mirror. This photo was admitted along with an ad Miles posted on an internet dating site seeking to meet women for sexual relations. Because we find the photo relevant to the matter of sentencing, we overrule Miles' second point of error.[11]

---

[11]Miles' appellate brief also argues the photo, even if relevant, was inadmissible because it could only have relevance as evidence of character conformity. Miles did not make this objection to the trial court, and we will not consider it. *See* TEX. R. APP. P. 33.1.

13

## A.     Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).  Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree."  *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).  We may not substitute our own decision for that of the trial court.  *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B.     Analysis

"[T]he question at punishment is not whether the defendant has committed a crime, but instead what sentence should be assessed."  *Thompson v. State*, 425 S.W.3d 480, 491 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (alteration in original) (quoting *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)); *see also Ellison v. State*, 201 S.W.3d 714, 718 (Tex. Crim. App. 2006).  Under Article 37.07 of the Texas Code of Criminal Procedure, any evidence that the trial court "deems relevant to sentencing" is admissible during the punishment phase of a trial.  TEX. CODE CRIM. PROC. ANN. art. 37.07(3)(a)(1) (West 2018); *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008).  If the evidence "will assist the fact[-]finder in deciding the appropriate sentence in a particular case," it is relevant to determining punishment.  *Sims*, 273 S.W.3d at 295 (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000)).

14

During punishment, the State offered a frontal nude photo of Miles that he had taken of himself in a bathroom mirror. The State presented testimony from Lisa Lozada, a former girlfriend of Miles, who authenticated the photograph. Lozada also testified she had seen other similar photos of Miles on his cell phone during their relationship. Miles objected to the photo, claiming it was not relevant. The State answered Miles' objections to the relevancy of the photo by arguing it was "relevant . . . given the sexual nature of this particular offense." The State continued, "And again, it goes back to the same thing. I think sexual-wise, I'm saying about these Craigslist advertisements, they tell this jury an awful lot about this Defendant, and they're the ones being asked to specifically tailor a punishment."

We find admission of the photo of Miles naked was within the zone of reasonable disagreement as to punishment. Lozada described an abusive relationship with Miles which lasted about four years. She described Miles choking and slapping her in the course of sexual relations. Miles was "very aggressive" and said "things that [made] him dominant in the bedroom." Miles, Lozada said, thought inflicting pain on her in the sexual act "was a game." While the photo was not dated, Lozada had seen such photos on Miles' phone during their relationship, and she had told him not to send such photos to her because she did not like it. Lozada also testified that Miles used her computer to place explicit personal ads seeking other sexual partners. These ads were placed during or near the end of her relationship with Miles.

The trial court could have concluded that the photo, in conjunction with the personal ads, showed Miles was looking for sexual partners while still in a relationship with Lozada. Based on Elinor's description of the offense and Lozada's descriptions of Miles' abusive and violent

15

behavior toward her, the photo could be seen as evidence of Miles' propensity to act as a sexual predator, or one seeking sex partners with whom he would be violent. Given the offenses of which Miles was convicted, we find that the photo of him naked was relevant to the jury's sentencing obligation.[12] As a result, we overrule Miles' second point of error.

## IV. Conclusion

The trial court's judgment is affirmed.

Scott E. Stevens
Justice

Date Submitted: February 22, 2019
Date Decided: May 22, 2019

Do Not Publish

---

[12]We find support for this holding in *Baird v. State*, 379 S.W.3d 353 (Tex. App.—Waco 2012), *aff'd*, 398 S.W.3d 220 (Tex. Crim. App. 2013). After being convicted of possession of child pornography the State offered as punishment evidence

> photographs of Baird in bondage and sadomasochistic poses similar to poses of children in Baird's child pornography photographs; photographs of nude young men engaging in sexual conduct in camping situations; Baird's nonsexual photographs of actual boy scouts on camping trips (Baird was a scout leader); internet chat sessions regarding sexual activity, including wearing sexual devices, and meeting for sex.

*Id.* at 359. The Waco Court of Appeals found admission of this evidence to be within the zone of reasonable disagreement. Baird argued the evidence consisted of "constitutionally protected homosexual conduct," but the court observed that "[s]uch evidence may be admissible if it is shown to be relevant to the issues involved in the case." *Id.* at 359, 360.